IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NORTHERN NATURAL GAS COMPANY,

    Plaintiff,

vs.      Case No. 04-1295-JTM

NASH OIL & GAS, INC.,

    Defendant.

MEMORANDUM AND ORDER

The present matter arises from defendant's motion for summary judgment. For the following reasons, the court grants defendant's motion.

Plaintiff Northern Natural Gas Company (hereinafter "Northern"), a large public utility company, operates the Cunningham Natural Gas Storage Facility located in south central Kansas. Defendant, Nash Oil & Gas, Inc. (hereinafter "Nash") operates certain wells four to five miles north of the Cunningham facility. Plaintiff sued defendant alleging that gas from the Cunningham facility migrated into the strata beneath the Nash leases and is now produced by Nash. Northern sued for conversion and for remedies under K.S.A. § 55-1210, including the right to conduct tests on Nash's wells to determine if the gas produced by defendant is storage gas. The court previously granted defendant's motion to dismiss plaintiff's claims for testing holding that defendant's wells were not on property which is "adjacent" to the storage field as required by K.S.A. § 55-1210. The remaining question to be considered by the court is whether Northern can assert ownership rights to gas that has allegedly migrated from plaintiff's field

under either K.S.A. § 55-1210 or under the common law doctrines of conversion and unjust enrichment.

Defendant Nash submits two bases for summary judgment. First, defendant argues that plaintiff knew gas allegedly escaped from the Cunningham storage field to the north in 1995 or by 1999, at the latest. Northern, however, filed the present lawsuit in 2004. Therefore, defendant argues, plaintiff's claims are barred under the applicable statutes of limitations.

Second, defendant notes that in a previous case, Northern sued TransPacific Oil Corporation (hereinafter "TransPac") and others alleging that storage gas migrated to TransPac's leases north of the storage field and was produced by TransPac at wells located on such leases. After a jury trial, the jury found that gas did not migrate from the Cunningham facility to the TransPac leases on or after July 1, 1993, the date K.S.A. § 55-1210 became effective. The court entered a judgment that due to the jury's determination that gas did not migrate to the TransPac leases after the effective date of the statute, the statute was inapplicable. Based on the jury's determination, the court held that TransPac case was not liable for conversion. Defendant argues that the jury verdict and judgment in the TransPac case hold preclusive effect in the current case.

*I.  Factual Background*:

*A.  The Current Litigation*:

Plaintiff Northern is a "natural gas company" as defined in the Natural Gas Act (15 U.S.C. § 717(a)) and is engaged in the business of the transportation and storage of natural gas in interstate commerce. Northern operates the Cunningham storage facility in Pratt County and Kingman County, Kansas. Defendant Nash owns oil and gas leases upon which the Young 1-26,

Holland 1-26, Vernon 1, and the JC 1 wells (hereinafter "the Nash wells") are operated in Pratt County, Kansas. The Nash wells are located approximately four and one-half miles north of the northernmost boundary of the Cunningham storage facility.

Louis P. Soldano of Northern sent Jerry Nash, president of Nash, a letter on January 20, 1999 which stated that "Northern is attempting to complete its review of the conditions in and around the Cunningham field," and requested various categories of information from defendant concerning its operation of the Young 1-26, Holland 1-26, and Vernon 1 wells. Mr. Soldano also stated that Northern would not be interested in paying defendant for such wells based on "the ability of [the] wells to produce storage gas. . . ." Defendant's Exhibit B.

Gordon Stull, attorney for defendant, sent a letter to Mr. Soldano in response to the January 20, 1999 letter stating that Nash had specific reservations about producing the information. Mr. Stull also stated:

> Your letter also indicates that Northern would not be interested in paying anything to Nash Oil & Gas based upon the ability of their wells to produce storage gas, but you might be willing to consider paying for the wells as observation wells. Does, in fact, Northern have credible information available to it to suggest that the Nash Oil & Gas, Inc., wells are producing storage gas?

Defendant's Exhibit C.

In response to Mr. Stull's February 5 1999 letter, Jeff Kennedy, attorney for Northern, sent Mr. Stull a letter in which he stated that, based on samples of gas taken from Nash wells, it was Northern's belief that the gas produced at the Nash wells was in fact storage gas. Mr. Kennedy also stated that Northern's studies indicated that "storage gas may be moving through a pathway in the Viola [formation] toward wells operated by TransPacific Oil Corporation located in Section 14, Township 27 South, Range 11 West." Defendant's Exhibit D.

3

Mr. Kennedy sent a letter to Mr. Stull on March 8, 2000, which stated that Northern was continuing to investigate the alleged production of storage gas at the Nash wells. Mr. Kennedy also requested defendant to sign a "Tolling Agreement" attached to the letter. The agreement proposed to toll the statute of limitations for claims between plaintiff and defendant for a period beginning on June 30, 1998 and continuing indefinitely until one hundred and twenty (120) days after termination of the agreement by either party.

Mr. Stull responded to Mr. Kennedy's letter on March 28, 2000. He stated that Nash did not believe it was producing storage gas, that the continued inquiry by Northern served to cloud Nash's title in the leases and to disrupt its business, and that consequently, Nash did not agree to sign the tolling agreement. Defendant's Exhibit F.

Mr. Kennedy responded to Mr. Stull's letter by urging Nash to reconsider its position with respect to the agreement. Additionally, Mr. Kennedy threatened imminent litigation if Nash did not agree to the tolling agreement. Defendant's Exhibit G.

Finally, on May 22, 2000, Mr. Stull sent Mr. Kennedy a letter which stated that because Nash voluntarily provided information to Northern from which it could investigate the validity of its alleged claims, Nash was not willing to sign the tolling agreement.

More than three years later, on September 3, 2004, Northern filed its complaint and on September 29, 2004, an application for an order allowing tests to be conducted on Nash's wells. In response, Nash provided equitable defenses, including the passage of the statute of limitations and a defense under Fed. R. Civ. Proc. 12(b)(6) for failure to state a claim upon which relief can be granted. Nash also denied Northern's allegation that the gas produced at the Nash wells was storage gas. Nash counterclaimed against Northern for trespass.

The court held a hearing on December 16, 2004 on Northern's application for an order allowing tests to be performed on the Nash wells. Following the hearing, the court entered an order on April 15, 2005, which denied Northern's application. On May 16, 2005, the court issued an order which partially granted defendant's motion to dismiss based upon the court's finding that the Nash wells were not on "adjoining property" to the Cunningham storage facility.

In the course of discovery in this case, Nash submitted the following interrogatory to Northern: "Do you contend that the Cunningham storage field has had gas escape from the confines of that field?        (A) Please describe the event or events which you believe lead to the Cunningham storage field leading gas into the surrounding area." In response, Northern stated:

> NNG contends storage gas has migrated from the field and has been produced by the wells which are the subject of this litigation. The migration of storage gas from the field to the wells which are the subject of this litigation resulted from injections into the subsurface storage reservoir and production from the TransPacific Oil Corporation wells, the Nash Oil & Gas, Inc. wells and wells offsetting and in the area of the Nash Oil & Gas, Inc. wells.

Defendant's Exhibit I, at Answer 3.

### B.  The TransPac Case:

On November 19, 2002, Northern filed its complaint against TransPac, BE USA, L.P., VESOCO, LLC, and AIR Pipeline Corporation. Northern asserted that natural gas produced at the TransPac wells was storage gas. In its complaint, Northern stated various theories of recovery, including conversion and unjust enrichment, which were dependent upon K.S.A. § 55-1210. The parties identified the following as issues of fact with respect to both Northern's conversion claim and its claim under K.S.A. § 55-1210:

> (a) Whether the gas produced and sold by the defendants was natural gas injected by plaintiff; (b) If the gas produced and sold by defendants was natural gas injected by plaintiff, the dates on which the gas was injected by Northern, the dates when it migrated to the Park gas wells in question and the dates when it was produced by Defendants.

Defendant's Exhibit J, TransPac Pretrial Order, at pp. 9, 12.

Upon the trial's completion, the court submitted the following jury instructions: "The court has determined as a matter of law that the Plaintiff's claims are limited to a period between July 1, 1993 and May 30, 2005, and you may award damages only for that period." Defendant's Exhibit K, Jury Instructions from TransPac Case, at pg. 31. To the first question: "1. On or after July 1, 1993, did Northern's stored gas migrate to the area of 'No.1 Park' and 'No. 1 Park A' wells?" the jury answered "no." Defendant's Exhibit L. The jury also found that the defendants were entitled to a verdict of $1,140,000 for damages in relation to the shutting-in of the TransPac wells.

Although Northern filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial under Fed. R. Civ. P. Rules 50 and 59, the court denied Northern's motion and held that K.S.A. § 55-1210 must be applied prospectively as opposed to retroactively as Northern argued. The court stated that Northern's reasoning that the statute should be applied retroactively "contradicts general principles of statutory construction which discourages interpreting a statute as retroactive unless the legislature is explicit . . . Under these circumstances, the court properly instructed the jury to determine whether gas migrated after June 30, 1993." Defendant's Exhibit O, Memorandum and Order, at pg. 8.

*II. Standard of Review*:

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. In considering a motion for summary judgment, the court must examine all of the evidence in a light most favorable to the opposing party. *Jurasek v. Utah State Hosp.,* 158 F.3d 506, 510 (10th Cir. 1998). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Baker v. Board of Regents,* 991 F.2d 628, 630 (10th Cir.1993). The moving party need not disprove the nonmoving party's claim or defense; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

The party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. ``In the language of the Rule, the nonmoving party must come forward with `specific facts showing that there is a *genuine issue for trial.*' '' *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita* ). The opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the opposing party must present significant admissible probative evidence supporting that party's allegations. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

*III.  Conclusions of Law*:

*A.  Statute of Limitations*:

Defendant first argues that summary judgment is appropriate because plaintiff's claims are barred by the applicable statutes of limitation.

The applicable Kansas statue of limitations for plaintiff's claim of conversion is two years. *See* K.S.A. § 60-513(a)(2) ("The following actions shall be brought within two years: . . . (2) an action for taking, detaining or injuring personal property, including actions for the specific recovery thereof."). Additionally, for a claim of unjust enrichment, the applicable statute of limitations is three years. *See* K.S.A. § 60-512 ("The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing.").

Northern filed the present action on September 3, 2004. Under the applicable statute of limitations, Northern's claims must have accrued on or after September 3, 2002 or September 3, 2001, respectively. "Ordinarily, a cause of action accrues at the time of the act giving rise to the alleged injury or damage. If the injury is not simultaneous with the act, it accrues at the time the injury becomes reasonably ascertainable." *See v. Harley*, 257 Kan. 813, 820, 896 P.2d 1049, 1054 (1995); *see also Clark Jewelers v. Satterthwaite*, 8 Kan. App. 2d 569, 572, 662 P.2d 1301, 1304 (1983) ("a cause of action in tort for conversion or for the recovery of personal property accrues when substantial injury first appears or when it becomes reasonably ascertainable.").

Defendant notes that the facts demonstrate that Northern began to study whether gas was migrating out of the Cunningham facility as early as 1995. Following the study, throughout 1999 and 2000, Northern sent correspondence to defendant alleging that Nash was producing Northern's storage gas at the Nash wells and that Northern would imminently seek litigation to enforce its rights. Furthermore, during the same period, the plaintiff and defendant shared

8

information relating to the Nash wells, including gas samples provided in 1998 to be compared with storage gas samples, which Northern based its allegations that Nash produced storage gas. Therefore, defendant argues, at the very latest, plaintiff's claim accrued during 1999 or 2000. However, because plaintiff's complaint was filed nearly four to five years after the accrual date, its claims should be barred by the statute of limitations.

Plaintiff also argues that claims for conversion accrue when the fact of the injury becomes reasonably ascertainable. However, plaintiff notes that the injury was not reasonably ascertainable until plaintiff obtained results of a reservoir simulation model in 2003. Alternatively, plaintiff argues that even if it could be argued that plaintiff should have reasonably ascertained the injury as early as 1999 or 2000, plaintiff's claims against defendant are timely due to the continuing tort doctrine. In *Cline v. Southern Star Central Gas Pipeline, Inc.*, 356 F. Supp. 2d 1203, 1214 (D. Kan. 2005), this court noted that although Kansas has applied the continuing tort theory in some contexts, Kansas courts have not yet applied it to a claim for conversion. In *Cline*, the plaintiff argued that each time he sent a letter to defendant requesting defendant provide him with gas, the statute of limitations "restarted." The court held that the letters did not constitute "new acts" by defendant and therefore did not support a claim for a continuing tort.

Plaintiff distinguishes *Cline* from the current case by arguing that each time Nash produced plaintiff's storage gas is a separate and distinct act of conversion.

The court disagrees with plaintiff. First, the injury became reasonably ascertainable when Northern's counsel sent a letter to Nash's counsel on February 19, 1999 which stated its belief that gas produced at the Nash wells was storage gas. Specifically, in the letter, Northern's

9

counsel notes that an "intense study" had been conducted since 1993 "in an effort to determine whether storage gas was being contained within [the Viola formation]." Defendant's Reply Exhibit A.  The letter also stated that "gas samples have been collected from [Nash's] wells and the preliminary indication is that this gas resembles storage gas much more than it resembles native gas from wells in the immediate vicinity of the storage area." *Id*.  Thereafter, plaintiff's counsel continued to send letters to defendant.  Therefore, by 1999 or 2000, plaintiff's claim fully accrued and the statute of limitations began to run because the injury was reasonably ascertainable to plaintiff at that time.  Although plaintiff argues that the injury was not reasonably ascertainable until the testing was conducted in 2003, the standard for the applicable statute of limitations in this context is "reasonably ascertainable" and not "actual knowledge." *See Kelley v. Barnett*, 23 Kan. App. 2d 564, 568, 932 P.2d 471, 474-75 (1997) (finding that "reasonably ascertainable" means that a plaintiff has the obligation to reasonably investigate available sources that contain the facts of the injury and noting that "reasonably ascertainable" does not mean "actual knowledge.").

Moreover, plaintiff's reliance on *Cline* in support of the continuing tort theory is misplaced.  The Cline court noted that the continuing tort doctrine cannot be applied where the plaintiff's injury is "definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress." *Cline*, 356 F. Supp. 2d at 1214.  Here, plaintiff's injury was discoverable and nothing prevented the plaintiff from seeking redress as early as 1999 or 2000.  Indeed, plaintiff's counsel sent numerous letters to defendant beginning in 1999 which stated its belief that defendant's wells produced storage gas.  Therefore, the court finds that the continuing tort doctrine is inapplicable to the current case.  Plaintiff's injury was reasonably ascertainable as

10

early as 1999 or 2000. However, plaintiff did not file its complaint until 2004, after the statute of limitations expired for the conversion and unjust enrichment claims. The court grants defendant's summary judgment motion because plaintiff's claims are barred by the applicable statute of limitations.

## B.  *Collateral Estoppel*:

Alternatively, defendant argues that the jury verdict and judgment from the TransPac case preclude plaintiff from re-litigating issues in the present case due to the doctrine of collateral estoppel. "Issue preclusion, or collateral estoppel, prevents relitigation of an issue by a party against whom the issue has been conclusively determined in a prior action." *Hall v. Doering*, 997 F. Supp. 1445, 1459 (D. Kan. 1998). In order for collateral estoppel to apply, four conditions must be met:

> (1) the issue previously decided is identical with the one presented in the action in question; (2) the prior action has been finally adjudicated on the merits; (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*B-S Steel of Kansas, Inc. v. Texas Indus., Inc.*, 439 F.3d 653, 662 (10th Cir. 2006) (citing *Estate of True v. C.I.R.*, 390 F.3d 1210, 1232 (10th Cir. 2004)). The second and fourth elements are met because the TransPac case was addressed in a jury trial and fully adjudicated on the merits. Furthermore, Northern had a full and fair opportunity to litigate the issue in the prior action.

In determining whether identical issues are present, several factors should be considered:

> . . . Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could

11

> pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

Restatement (Second) of Judgments § 27 cmt. c (1982). Defendant argues that in the TransPac case, the jury considered the precise factual issue of whether gas migrated from the Cunningham storage facility on or after July 1, 1993, the effective date of K.S.A. § 55-1210. The jury determined that the gas did not migrate after the effective date of the statute and therefore, returned a verdict in favor of TransPac, the original defendant. Defendant notes that the factual issue of whether the gas migrated from the Cunningham facility prior to or after the effective date of the statute, July 1, 1993, will determine whether Northern can avail itself of the protection provided in K.S.A. § 55-1210 in this case.

Plaintiff primarily argues that the first action determined the question of whether the stored gas migrated to the Park wells after July 1, 1993, and did not consider the Nash wells in this case.

On numerous occasions, Northern's expert, Michael Begland, testified that the model his firm formulated which led to the litigation over the Cunningham facility began with the determination that there was allegedly a direct communication between the Cunningham field and the Park leases on which the TransPac wells are located. However, the data would not fit a model which contained the gas in the Park area, and therefore, Mr. Begland testified that he then determined that the gas which allegedly migrated to the TransPac leases "had to leave from the [TransPac] lease area to the north towards the Nash area." Defendant's Statement of Facts, at ¶ 19. Additionally, in response to interrogatories, Northern stated that the migration at issue in this case began with the injection of gas into the storage facility which was drawn to and

12

produced at the TransPac wells and then at the Nash wells. *Id.* Based on this testimony, plaintiff's theory is based on a direct line of communication or a single pathway of migration from the Cunningham facility to the TransPac wells and then to the Nash wells. It is clear that this theory is an extension of the theory presented in the TransPac case. Additionally, plaintiff asserts the identical rule of law, K.S.A. § 55-1210 and the same claims to rights under the statute as well as for the common law claims of conversion and unjust enrichment. Therefore, the court finds that the issues are the same in both cases and the first prong for collateral estoppel is met.

With respect to the third prong for collateral estoppel, plaintiff argues that Kansas law should be applied. Kansas law differs from federal law on the collateral estoppel doctrine in that Kansas law requires mutuality among the parties in order for collateral estoppel to apply. *Keith v. Schiefen-Stockham Ins. Agency, Inc.*, 209 Kan. 537, 545, 498 P.2d 265, 273 (1972). In *Petromanagement Corp. v. Acme-Thomas Joint Venture*, 835 F.2d 1329 (10th Cir. 1988), the Tenth Circuit held that federal law governs the application of res judicata where the issue is not clearly substantive. *Id.* at 1333. Following *Petromanagement*, this court has held that mutuality is not a distinctively substantive matter. *Scheufler v. General Host Corp.*, 881 F. Supp. 492, 495. "The basic rules of claim and issue preclusion in effect define finality and hence go to the essence of the judicial function. *Id.* (quoting Restatement (Second) of Judgments § 87, cmt. b). Additionally, the *Scheufler* court stated that federal courts have a strong interest in determining the scope and finality of their own judgments. *Id.* (finding that the court must apply the federal law of collateral estoppel in the matter). Therefore, the court will apply federal law on the collateral estoppel claim.

In applying federal law to the collateral estoppel claim, defendant must demonstrate that it was a party in privity with a party to the prior adjudication. In *Crutsinger v. Hess*, 408 F. Supp. 548 (D. Kan. 1976), the court concluded that defensive collateral estoppel is permissible by a party who was not present in the prior action – when at least the party against whom it is invoked was a party to the prior litigation. *Id*. at 554. Following the *Crutsinger* holding, the United States Supreme Court noted: "Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries.' Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329 (1979) (quoting *Bernhard v. Bank of America*, 122 P.2d 892 (Cal. 1942)). This court has routinely followed the allowed the use of defensive collateral estopppel since the holding in *Crutsinger*. *Beckett v. U.S.*, 217 F.R.D. 541, 543-44 (D. Kan. 2003) (noting that Judge O'Connor in *Crutsinger* held that collateral estoppel may be asserted where . . . (3) the party against whom the plea of collateral estoppel is asserted was a party to the prior action; and (4) the doctrine of collateral estoppel is invoked defensively, as a shield to liability, against a plaintiff bringing suit on an issue that he litigated and lost as a plaintiff in a prior action). Under this rule, Northern was the plaintiff in the previous action and now asserts a separate action against a different defendant, Nash. Nash now asserts collateral estoppel against Northern, who was the plaintiff in the prior action. Defendant thus uses collateral estoppel as a defensive mechanism, a shield to liability against Northern from bringing suit on an issue previously litigated and lost as a plaintiff. The court finds that the four elements of collateral estoppel are met. Therefore, the court grants defendant's motion for summary judgment on this issue.

IT IS ACCORDINGLY ORDERED this 27th day of March, 2007, that defendant's motion for summary judgment (Dkt. No. 97) is granted.

s/ J. Thomas Marten<br>J. THOMAS MARTEN, JUDGE